**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------

P.B. and M.R., on behalf of B.B.,

Plaintiffs,

        - against -                             **COMPLAINT**

New York City Department of Education,        **08 CV 3175 (SHS)**

Defendant.

----------------------------------------------------------------

Plaintiffs, P.B. and M.R., on behalf of B.B., by their attorneys, Mayerson & Associates, as and for their Complaint, allege and states the following:

1. Plaintiff B.B., the son of plaintiffs P.B. and M.R., is a minor child who has been diagnosed with a serious autism spectrum disorder. B.B. was at all relevant times was and is a student residing within the New York City School District entitled to all rights, entitlements, and procedural safeguards mandated by applicable law and statutes including, but not limited to the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400, *et. seq.*, the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education law and Part 200 of the Commissioner's Regulations.

2. Plaintiffs P.B. and M.R. are the parents of B.B. Plaintiffs are residents of the State of New York, residing at all relevant times at an address, in Manhattan, within the New York City School District.

3. B.B. and his parents P.B. and M.R. are not expressly named herein by their given names or specific address because of the privacy guarantees provided in the IDEIA statute, as well as in the Family Educational Rights Privacy Act, 20 U.S.C. § 1232(g) and 34 C.F.R. § 99.

4.   Defendant New York City Department of Education ("NYCDOE"), upon information and belief, is a duly constituted school district organized under the laws of the State of New York, and is the agency charged with the obligations to provide B.B. with a free and appropriate public education ("FAPE"), *see infra*, ¶ 8.

## THE RELIEF BEING SOUGHT

5.   This action is brought pursuant to the provisions of 20 U.S.C. § 1400, *et. seq.*, more commonly known as the IDEIA and, in particular, 20 U.S.C. §§ 1415(i)(2) and (3).  *See also*, 34 C.F.R. §§ 300.516 and 300.517.

6.   This action is being brought to secure statutory attorneys' fees that plaintiffs are entitled to recover pursuant to the fee-shifting provisions of the federal IDEIA statute, 20 U.S.C. §§ 1415(i)(3)(A)-(G).  P.B. and M.R., on behalf of B.B., should be awarded attorneys' fees as the "substantially prevailing party" in a due process hearing for the 2005-2006 and 2006-2007 school years under New York City Impartial Hearing Office Case Numbers 59006 and 104820, respectively.

## JURISDICTION AND VENUE

7.   This Court, pursuant to 20 U.S.C. §§ 1415(i)(2) and (3), 34 C.F.R. §§ 300.516 and 300.517, 28 U.S.C. §§ 1331 and 1367, has jurisdiction of this action without regard to the amount in controversy.  Venue is proper in that plaintiffs and defendant reside in or are situated in this District.

8.   Pursuant to the IDEIA statute, as well as the New York State Education Law, all school agencies within the State are required to offer eligible students with disabilities special education

programs and services that are tailored to meet the individual needs of each child with a disability.  The FAPE required under IDEIA will be different for each child, as IDEIA does not permit a "one size fits all" approach.

### FACTUAL BACKGROUND FOR THE 2004-2005 AND 2005-2006 SCHOOL YEARS

9.  On or about April 14, 2005, P.B. and M.R., through their attorneys, Mayerson & Associates, filed for an impartial hearing at the administrative level in an effort to secure reimbursement and other relief relating to the 2004-2005 and 2005-2006 school years for the cost and expenses of B.B.'s program and related services.  B.B.'s parents filed for due process due to the NYCDOE's failure to recommend and provide an appropriate placement and program individualized for B.B.'s unique special education needs.

10. The evidentiary hearing on this matter took place on June 10 and 23, 2005.  Gary S. Mayerson, Esq., of Mayerson & Associates represented the plaintiffs.  The NYCDOE conceded at the hearing that it did not provide B.B. with an appropriate program for the 2004-2005 school year, thereby sustaining (in plaintiffs' favor) Prong I of the Burlington/Carter test for relief.[1] However, the NYCDOE did contest that plaintiffs' claims regarding the 2005-2006 school year were premature.

11. Plaintiffs entered 43 exhibits and the testimony of four witnesses into evidence in support of their case.  The NYCDOE offered one document and no testimony in support of their position or challenging the appropriateness of the program privately arranged by J.D.'s parents.

---

[1] Reference is made to School Committee of Burlington v. Dept. of Educ. of Massachusetts, 471 U.S. 359, 105 S.Ct. 1996 (1985), and Florence Court School Dist. Four v. Carter, 510 U.S. 7, 114 S.Ct. 361 (1993), which set the standards for determining whether a handicapped child's unilateral educational placement is eligible for reimbursement relief.

12. By "Findings of Fact and Decision" dated August 4, 2005, Impartial Hearing Officer Linda Agoston Esq., rendered an award in favor of plaintiffs, establishing plaintiffs as the substantially prevailing party in the administrative due process proceeding.[2]  Defendant never appealed from this decision, which thus became final and non-appealable on or about September 9, 2005.

### FACTUAL BACKGROUND FOR THE 2006-2007 SCHOOL YEAR

13. On or about May 30, 2006, P.B. and M.R., through their attorneys, Mayerson & Associates, filed for an impartial hearing at the administrative level in an effort to secure reimbursement and other relief relating to the 2006-2007 school year for the cost and expenses of B.B.'s program and services.  B.B.'s parents filed for due process due to the NYCDOE's failure to recommend and provide an appropriate placement and program individualized for B.B.'s specialized needs.

14. The evidentiary hearing on this matter took place on June 28 and August 8, of 2006. Gary S. Mayerson, Esq. and Randi M. Rothberg, Esq. of Mayerson & Associates represented the plaintiffs.  The NYCDOE did not take a position whether its program was appropriate for B.B. (Prong I), however, it did challenge the appropriateness of the parents unilateral program (Prong II) and took the position that equitable factors (Prong III) do not support reimbursement because of the cost of the program is too high.

15. Plaintiffs entered 23 exhibits and the testimony of six witnesses into evidence in support of their case.  The NYCDOE offered no documentary or testimonial evidence testimony in

---

[2] A redacted copy of this decision is annexed hereto as Exhibit A.  Please note that all exhibits have been redacted so as to protect the privacy of the family. See ¶ 3.

support of their position or challenging the appropriateness of the program privately arranged by J.D.'s parents.

16. By "Findings of Fact and Decision" dated September 13, 2006, Impartial Hearing Officer Mindy G. Wolman, Esq., rendered an award in favor of plaintiffs, establishing plaintiffs as the substantially prevailing party in this administrative due process proceeding.[3]  Defendant never appealed from this underlying administrative decision, which thus became final and non-appealable on or about October 18, 2006.

## CONCLUSION

17. The defendant is liable to pay plaintiffs their reasonable attorneys' fees arising out of B.B.'s successive IDEIA administrative due process proceedings, and in this action, at plaintiffs' counsel's current "prevailing" rates.   The fees requested herein are entirely reasonable and appropriate because:

(a) upon information and belief, plaintiffs' attorneys' office is the only firm in the country whose practice is devoted almost exclusively to representing children and adolescents with autism spectrum disorders, like B.B., in educational rights disputes;

(b) the principal of plaintiffs' attorneys' firm has testified before the United States Congress on the subject of the educational rights of children diagnosed with autism spectrum disorders;

(c) plaintiffs' attorneys have published and presented on the subject of the educational rights of children diagnosed with autism spectrum disorders;

(d) plaintiffs' attorneys have special knowledge and expertise concerning the educational needs of children diagnosed with autism spectrum disorders;

---

[3] A redacted copy of the decision has been annexed hereto as Exhibit B.

(e) plaintiffs' attorneys' office has represented children with autism spectrum disorders in numerous states across the nation, and has consulted to families outside of the United States; and

(f) to the extent that there is a "prevailing rate" in the Southern District of New York for sophisticated autism intervention cases, plaintiffs' attorneys' prevailing rates are reasonable and within the applicable standard.

18. Necessary duties involved with preparing B.B.'s cases for administrative due process hearings for the 2004-2005, 2005-2006 and 2006-2007 school years included, but were not limited to: (a) corresponding with plaintiff's service providers; (b) holding numerous telephone conferences; (c) writing and filing impartial due process hearing requests; (d) reviewing and disclosing documentary information relevant to B.B.'s claims; (e) scheduling and preparing witnesses to testify at the hearings; (f) developing effective case presentations for the 2004-2005, 2005-2006 and 2006-2007 school years; and (g) preparing closing statements.

19. Additional fees and costs have been incurred, and will continue to be incurred in this action.

20. For all of the above efforts, plaintiffs should be awarded attorneys' fees, related costs and disbursements for the 2004-2005, 2005-2006 and 2006-2007 school years, in an amount to be set by this Court, at plaintiffs' counsel's currently prevailing rates.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, this Court should (a) fix and award plaintiffs their statutory attorneys' fees and related costs and disbursements from the IDEIA due process proceedings for the 2004-2005, 2005-2006 and 2006-2007 school years in an amount to be set by

the Court, at plaintiffs' counsel's current prevailing rates, (b) award plaintiffs the attorneys' fees and related costs and disbursements associated with this action in an amount to be set by the Court, and (c) award plaintiffs such other, different and further relief as this Court deems proper.

Dated: March 31, 2008
      New York, New York

                                            Gary S. Mayerson (GSM 8413)
                                            Mayerson & Associates
                                            330 West 38th Street, Suite 600
                                            New York, New York 10018
                                            (212) 265-7200
                                            (212) 265-1735 (facsimile)
                                            admin@mayerslaw.com

## FINDINGS OF FACT AND DECISION

| | |
|---|---|
| Case Number: | 59006 |
| NYS Case Identifier Number: | 14124 |
| Student's Name: | B████ B████ |
| Date of Birth: | March 4, 1996 |
| District: | 15 |
| Hearing Requested By: | Parents |
| Date of Hearing: | June 10, 2005<br>June 23, 2005 |
| Hearing Officer: | Linda Agoston, Esq. |

Case No.  59006

_____

### NAMES AND TITLES OF PERSONS WHO APPEARED JUNE 10, 2005

| | | |
|---|---|---|
| Gary Mayerson | Attorney | Parent |
| R██ J B██ | Father | |
| M███ R██ | Mother | |
| Susan Foley | Occupational Therapist | Parent |
| Lisa Frenette | Behavior Consultant | Parent |
| Patricia Collins | Chairperson Designee, School Psychologist, CSE, District 15 | Department of Education |

### NAMES AND TITLES OF PERSONS WHO APPEARED JUNE 23, 2005

| | | |
|---|---|---|
| Gary Mayerson | Attorney | Parent |
| R██ J B██ | Father | |
| M███ R██ | Mother | |
| Patricia Collins | School Psychologist and Chairperson Designee, CSE, District 15 | Department of Education |

Case No. 59006

---

The matter of B████████B. came on for hearing before me on 6/10/05, the date of my designation as impartial hearing officer, pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1415(f)(3). The hearing was convened at the request of the parents that was received on 4/15/05. On 4/28/05, the initial impartial hearing officer scheduled this case to be heard on 6/10/05. I was appointed to hear this case on 6/3/05, after the original hearing officer was not available to attend the hearing due to a car accident. The hearing commenced on 6/10/05 and concluded on 6/23/05. The compliance date was extended as a result of the request for additional hearing dates. Appended to the record are lists of persons in attendance and of documents submitted into evidence.

The hearing was requested by the parents to challenge the program and recommendation of the Committee on Special Education (CSE), and to obtain funding for the special education program and services they have provided for B██████. The parents brought the hearing seeking reimbursement for the 2004-2005, the summer of 2005 and compensation for the 2005-2006 school year.

**BACKGROUND**

B██████ is 9 years old and is classified as Pervasive Developmental Disorder, Not Otherwise Specified (PDD-NOS), which is a disorder on the autism spectrum. On 12/98, he was diagnosed with PDD-NOS. (Exh. J) When he was 2.5 years old, B██████ was initially evaluated and the evaluation recommended early intervention services at Children's Home Intervention Program (CHIP) in Brooklyn Heights, New York. (Tr. at 154) AT CHIP, he received 25 to 30 of Applied Behavioral Analysis (ABA) and as well as 10 hours of at-home special education itinerant teacher (SEIT) services for ABA services, and related services of occupational therapy (OT) for 5 sessions per week for 60 minutes per session and speech and language therapy for 5 sessions per week for 60 minutes per session. In the fall of 1998, B██████attended a mainstream nursery school, at Temple Israel from age 2.5 until 4.5 where the Committee on Preschool Special Education (CPSE) recommended that he received at-home SEIT for ABA services, and related services of individual speech and language therapy for 5 sessions per week for 60 minutes per session and individual OT for 5 sessions per week for 60 minutes per session.

Case No. 59006

---

On 6/00 through 8/01, from age 4.5 until 5.5, B▮▮▮▮▮ was classified as a preschool student with a disability and CPSE recommended that he be placed in a center-based 12-month program, 5 hours per day, 5 days a week. The recommended site was the Central Park Early Learning Center where B▮▮▮▮▮ received ABA at school in class and he received related services of speech and language therapy and OT, but the at-home services of a SEIT who provided ABA were discontinued. In 9/01, B▮▮▮▮▮ aged out of the CPSE and he fell into the jurisdiction of the CSE. B▮▮▮▮▮ attended Learning Spring Elementary School for a few months and he encountered difficulties at the Elementary School because he required a more intensive ABA program so in 1/02, he transferred to Brooklyn Blue Feather Elementary School (BBF), a New York State approved program recommended by AHRC for autistic children. B▮▮▮▮▮ remained at BBF for the school years 2002-2005. (Tr. at 157)

The parents expressed concern over the 2004-2005 school year when the monthly clinics or parent/teacher meetings ceased. The mother again expressed her concern when she observed B▮▮▮▮▮s class on 12/17/04 and 1/27/05. She observed regression in B▮▮▮▮▮s behavior and wrote to the CSE Chair on 1/27/05 (Exh. I) and again on February 16, 2005. (Exh. K) In response to the parent's letters, CSE met on 3/2/05. (Exh. M) The 3/2/05 IEP indicated that the case was to be deferred to Central Based Support Team (CBST) for a new placement (Exh. M at 1) and recommended related services of speech and language therapy for 3 times a week for 30 minutes per session and OT twice a week for 30 minutes per session. (Exh. M at 14) Absent from the CSE meeting were B▮▮▮▮▮s teachers at BBF, his at-home ABA teachers from IBI, his related service providers and the parent member. (Exh. M at 2; Tr. at 161)

On 6/6/05, CSE again convened and classified B▮▮▮▮▮ as autistic and recommended a New York State Education Department Approved Non Public School placement at BBF with a staff-child ratio of 1:4:8 or 1 special education teacher and 4 aides for 8 children. (Exh. 1) The 6/6/05 Individualized Education Program (IEP) recommended related services of speech and language therapy 5 times per week for 30 minutes per session. (Exh. 1 at 16)

Case No.  59006

From 3/2/05 to date the CSE has not submitted the Final Notice of Recommendation nor have the parents been contacted by CBST regarding a new placement.    The parents expressed their concerns about ▇▇▇▇'s deterioration throughout the year to the principal of BBF. (Exhs. C, I)  As a result of ▇▇▇▇'s deterioration the parents have created an at-home program consisting of ABA therapy and OT. The parents began their home program in 7/04.

The parents request reimbursement for their at-home ABA services and related services as follows: (1) the at-home ABA therapy from Incidental Behavioral Intervention, (IBI) Associates including Lisa Frenette, Director of IBI and other therapists from IBI for 4 hours a week from 6/04 through 4/30/05 in the amount of $15,581.25; (Exh. Z at 1) and $1,360 (Exh. Z at 2) for 5/2/05 through 5/21/05; (2) the OT for 1 hour per week from 7/24/04 through 6/9/05 provided by Susan Foley at The Sensory Circuit in the amount of $5,200; (Exh. EE) (3) Special Needs Activity Center for Kids, (SNACK) program from 10/1/04 through 7/1/05 in the amount of $2,700. (Exh. FF)

The parents request reimbursement or prospective payment for the SNACK from 7/1/05 through 6/30/06 and request reimbursement or prospective payments from 7/5/05 through 6/30/06 for the cost of tuition at the McCarton Center for 25 hours of ABA per week, 4 hours of speech and therapy per week, 3 hours of OT per week, 2 to 4 hours of supervision and monthly program development meetings. (Exh. OO)   The parents requested reimbursement or prospective payment for the McCarton Center for Speech and Language Therapy for 4 hours per week @ $155 per hour; OT for 3 hours per week @ $155 per hour; and ABA Therapy for 24 hours per week @ $130 per hour for a total of $4,205 per week and 2 to 4 hours of supervision @ $175 per hour and monthly meetings @ $175 per hour.  The parents requested reimbursement or prospective payment for OT twice per week for 45 minutes per session @ $130 per session from Susan Foley at the Sensory Circuit for a total of $260 per week.  The parents requested reimbursement or prospective payment at SNACK for 2 hours per week for total of $100 per week.  The parents request a total amount of $4,565 per week starting 7/5/05 through 6/30/06.  The parents also request reimbursement or prospective payment for 2 to 4 hours per week of

Case No.  59006

_____

supervision @ $175 per hour and monthly program development meetings @ $175 per hour.

**THE POSITION OF THE PARTIES**

The Department of Education has recommended that B████ be placed in a more appropriate placement than BBF and agreed that B████ was entitled to whatever ancillary services were appropriate while the CBST attempted to find an appropriate placement. (Tr. at 15)  The parents have created an at-home program consisting of ABA therapy from IBI Associates and OT from Susan Foley and request reimbursement for their at-home program from 6/04 through 6/30/05 and for reimbursement or prospective payment from 7/5/05 through 6/30/06 of approximately 24 hours a week of direct education of ABA at the McCarton Center, 4 hours a week of speech and language therapy from the McCarton Center, 3 hours per week of OT from the McCarton Center, 2 to 4 hours of supervision and monthly development meetings from the McCarton Center and OT from Susan Foley at the Sensory Circuit twice at week for 45 minutes per session and 1 session for 2 hours at SNACK per week.

**THE DEPARTMENT OF EDUCATION CASE**

Patricia Collins, the CSE District 15 representative, was present on behalf of the Department of Education.  She submitted 1 exhibit, but she did not present any witnesses nor did she testify except to the extent she responded to the questions of the attorney for B████ s family and questioned the parents' witnesses.  With respect to the 2004-2005 school year, Ms. Collins did not defend the 3/2/05 IEP or 6/6/05 IEP.  Ms. Collins offered no explanation on 6/6/05 IEP recommendation of BBF despite the fact that the 3/2/05 recommended a referral to CBST for a more appropriate placement.  Ms. Collins offered no explanation as to why the 6/6/05 IEP did not recommend OT despite the fact that the 3/2/05 IEP recommended OT.  Ms. Collins agreed that the 6/6/05 should have indicated that CBST was to find a more appropriate placement (Tr. at 17) and that OT should have been included as related services on the 6/6/05 IEP. (Tr. at 33 and 38)  Ms. Collins did not respond to the allegations that the BBF had had insufficient supervision of teachers and then no teachers nor related services providers for OT were present for the 2004-2005

Case No. 59006

school year. (Tr. at 24)  She did not defend the 2004-2005 placement at BBF.  Ms. Collins agreed that BBF was not an appropriate placement for B████████.  (Tr. at 12)  She did not oppose any of the parents' assertions or recommendations.  However, Ms. Collins did contest the fact that the parents are entitled to reimbursement for the 2005-2006 school year since she believed CBST did not have the opportunity to find a more appropriate placement. (Tr. at 46)  Ms. Collins maintained that the district had until 8/15/05 to make the recommendation for a more appropriate placement. (Tr. at 51)  Ms. Collins also questioned the reasonable of the rates charged by the McCarton Center. (Tr. at 284-286)

**THE PARENTS' CASE**

Mr. and Ms. B., and Susan Foley, B████████s occupational therapist, Lisa Frenette, B████████s at-home ABA therapist, testified in support of the parents' claim for reimbursement for their unilateral program of at-home ABA and OT from 6/30/04 through 7/5/05 and reimbursement or prospective payment for the McCarton Center, OT from Ms. Foley and the SNACK program from 7/5/05 through 6/30/05.  The parents argued that the district has failed to offer B████████ a free and appropriate public education (FAPE) on both procedural and substantial grounds and that the parents have unilaterally created their own appropriate special education program for B████████.  The parents stated that B████████s home program began in 6/04 and continued to 7/5/05.  From 6/04 to 7/5/05, B████████s home program and teaching schedule was 4 hours per week of home instruction IBI Associates and 1 hour per week of based sensory OT from Susan Foley. (Tr. at 60-93)  Ms. Frenette recommended that B████████ be placed at the McCarton Center from 7/5/05 through 6/30/05.  The McCarton program was described as follows: 25 hours per week direct instruction of ABA therapy, 4 hours per week of speech and language therapy, 3 hours per week of OT, 2 to 4 hours of supervision and monthly program development meeting.  The related services also included OT twice a week for 45 minutes per sessions from Susan Foley and 1 session of 2 hours at SNACK per week.

The parents also seek for their home program for the 2004-2005 year approximately $15,581.25 plus $1,360 for ABA therapy from Lisa Frenette from 6/23/04

Case No. 59006

---

through 5/21/05. (Exh. Z; Tr. at 263)  The parents submitted invoices and cancelled checks for Ms. Frenette totaling $15,581.25 (Exh. AA)  The parents seek approximately $6,500 for the OT for 1 hour per week from 7/24/04 through 6/9/05 provided by Ms. Foley at The Sensory Circuit and submitted invoices of Susan Foley (Exh. EE) and cancelled checks for Susan Foley totaling $6,500. (Exh. AA) The parents seek approximately $2,700 for SNACK from 10/1/04 through 7/1/05, (Exh. FF) and submitted cancelled checks for SNACK totaling $6,500. (Exh. AA)

The parents also seek compensation for a lack of FAPE for the 2004-2005 school year in the form of reimbursement or prospective payment for the McCarton Center for Speech and Language Therapy for 4 hours per week @ $155 per hour; OT for 3 hours per week @ $155 per hour; and ABA Therapy for 24 hours per week @ $130 per hour for a total of $4,205 per week and 2 to 4 hours of supervision @ $175 per hour and monthly development meetings at $175 per hour.  The parents requested reimbursement or prospective payment for OT twice per week for 45 minutes per session for $130 per session from Susan Foley at the Sensory Circuit for a total of $260 per week.  The parents requested reimbursement or prospective payment at SNACK for 2 hours per week for total of $100 per week. The parents request a total amount of $4,565 per week starting 7/5/05 through 6/30/06 in addition to the 2 to 4 hours of supervision and monthly program development meetings.

The parents believe that the unilateral program at home for 6/04 through 7/5/05 and the placement at the McCarton Center is appropriate and the equities favor them.  It is undisputed that the district did not provide FAPE for the 2004-2005 school year.  The parents believe that they are entitled to relief from the time frame governed by the 6/6/06 IEP. (Tr. at 45)

Ms. Foley, occupational therapist at Sensory Circuit & Gym, testified that she started to provide OT for B██████ from the end of 7/04 once a week for 45 minutes per week. (Tr. at 60)  She wrote an evaluation of B█████ on 2/18/05 that summarized his strengths and weaknesses. (Tr. at 61)  She stated that he had significant sensory issues and processing issues that impacted on his development and his ability to function. (Tr. at

Case No. 59006

61) She explained that he had many self-stimulating behaviors that interfered with his ability to receive her instruction. She reported that B████████ required an enormous amount of sensory input to his nervous system to organize himself for functional activities. (Tr. at 64) She recommended that he receive OT 5 times a week for 45 minutes per session. (Tr. at 64; Exh. L)

On cross Ms. Foley stated that B████████ requires individual OT because he is very distractive with children. She stated that she would have liked to work collaboratively with his providers at BBF, but there were problems with the occupational therapists at BBF. (Tr. at 74) She recalled that the therapist had a lot of problems with B████████ to try to take off his shoes and calm him. She opined that she could work with the therapist at the McCarton Center to help B████████ generalize his skills. (Id.)

Ms. Frenette, Director of IBI, testified that she worked for 14 years with autistic children as a NYC certified SEIT, ABA teacher and as a supervisor and consultant. She explained that she worked for the McCarton Center as the Director of Educational Intervention that included ABA and SEIT work and then she started IBI. Ms. Frenette stated that she had a certification in special education and was a certified behavioral analyst. (Tr. at 81)

Ms. Frenette explained that she first conducted a baseline assessment of B████████ using the Assessment of Basic Language and Learning Skills (ABLLS) charts. (Exh. Y) She charted a series of graphs to indicate B████████s progress in his aggressive behavior, his quiet time called "quiet hands", his verbal self-stimulating behavior, his "scripting" and when he responded to his name. (Exh. X; Tr. at 91) She stated that if B████████ exhibited aggressive behavior, there was very little instructional control so B████████ could not retain any information nor generalize that information nor utilize the information in his environment. She explained that when she started charting B████████ from 8/28/04 to 1/3/05, it took a span of several months to control his aggressive behavior as she could only provide ABA therapy for 3 to 4 hours per week (the hours the parents could afford) and she recommended an ABA program of 45 hours per week. (Tr. at 93) She stated that after she completed rid B████████ of aggressive behavior, she

started to decrease the incidents of verbal self-stimulating behavior and then worked on
the other self-stimulating behaviors that interfered with his learning.  She explained that
B████████ frequently engaged in "scripting" where he heard a sound or a quote a line or a
phrase and repeated it endlessly. (Tr. at 102)  She explained that when B████████ is
scripting, he cannot engage with the instructor.  She further explained that B████████
could not respond to his name, a skill a young child has, and noted that at age 8.5
B████████ was not receiving any behavioral instruction at school. (Tr. at 99)

Ms. Frenette recalled that when she started working with B████████, he wanted to
communicate with people and he disengaged in the attempt to communicate because he
was not successful and then he engaged in interfering behaviors. (Tr. at 105)  She
explained that she always conducts a functional behavioral assessment (FBA) to
determine the intervention required for instruction. (Tr. at 107)  She recalled that when
she visited BBF she observed B████████s teacher and aids rewarding or reinforcing
inappropriate behavior. (Tr. at 108)  She reviewed the 3/2/05 IEP on page 16 entitled
Behavioral Intervention Plan (BIP) and opined that no FBA was conducted to develop the
BIP.  She noted that there were no antecedents listed that triggered the behavior, no
clinical observation, no interview and no plan to address the behavior was developed. (Tr.
at 111)  She explained that an ABA trained therapist would never include a "break from
work" (Exh. I at16) as a reward to escape negative behavior which was the method
recommended on the BIP. (Tr. at 113)

Ms. Frenette explained that she conducted a formal observation at BBF (Exh. J)
on 12/6/04 and submitted her report of the observation on 2/15/05.  She recalled that in
her 14 years of instruction she never experienced a school with "such complete disregard
for children … and neglectful, neglectful instruction." (Tr. at 117) She stated that BBF
was filthy and disgusting and the aides were ignoring the children who were engaging in
self-stimulating behavior.  She stated that she observed the inappropriate use of
reinforcement by flicking a string back and forth to reward B████████.  She stated that
string should never be used to reinforce self-stimulating behavior.  She recalled that the
aide increased B████████s self-stimulating behavior. (Tr. at 120; Exh. J at 2)   She

Case No. 59006

remembered that there was no ABA therapy nor was any connection between B████

and his aide. She recalled in her report that the "aide lacked a clear understanding of the

tasks she was presenting … her overall inability to recognize as well as extinguish

behaviors and her general disregard for B████s ability to learn from instruction." (Tr.

at 122; Exh. J at 2)  She further recalled in her report that "B████ was engaged in a

great deal of verbal stimming and the aide responded by saying cover mouth." (Tr. at 124;

Exh. J at 3)  She stated to cover the mouth of any child was an utter and complete

disregard for B████. (Id.)  She remembered B████ was sitting in a chair stimming

uncontrollably while aide read notices to other staff members. (Tr. at 127; Exh. J at 5)

She recalled in her report that Steve, the head teacher, presented the same command to

B████ repeatedly and each time B████ responded incorrectly, Steve said "no,

B████" (Tr. at 130; Exh. J at 5)  She explained that ABA therapy utilizes "errorless

teaching" that will not allow him to error.  She explained ABA therapy should provide a

prompt ahead of the demand so the child will not make an error in the response. (Tr. at

133)  She further explained how "errorless teaching" enabled B████ to generalize his

skills. (Tr. at 134)  She recalled in her report that Steve told her he was in the travel

business and had no training and dreaded "clinic days" because he was not trained to

teach ABA and could not provide instruction. (Tr. at 136)  She related that B████

received no tangible benefit from BBF for the 2004-2005 school year. (Tr. at 137)  She

recalled in her report that "by putting the TV on … he would learn more." (Id.)  She

opined that the loss of instructional time for B████ was incalculable because he has

potential to learn and has good receptive skills.  She maintained that the 2004-2005

school year at BBF was a waste of B████s time. (Tr. at 138)

Ms. Frenette averred that it was a huge financial burden for the parents to pay for

ABA and they could only financially afford 4 hours per week to extinguish negative

behaviors; however, she recommended a minimum of 45 hours of individual ABA

therapy following the ABLLS curriculum trained in verbal behavior that utilized

"errorless teaching" per week; 45 minutes of speech and language therapy 4 times per

week and OT 5 times a week for 45 minutes per session and socialization in a group of no

Case No. 59006

---

more than 3 children shadowed by an ABA therapist to replace his current school placement at BBF. (Exh. at J at 11)

She related that B█████ had no ability to initiate a conversation, initiate or maintain social play with children. She maintained that at SNACK B█████ is able to be in a group without stimming. She stated that B█████ requires a trained ABA therapist to train him to socialize with others. (Tr. at 140-143) She noted IBI was unable to provide B█████ with the number of hours that he required. She opined that the McCarton Center would be able to appropriate provide all the recommendations listed in her report. (Tr. at 144) She explained that she billed the parents (Exh. G at 1-3) and the parents submitted cancelled checks. (Exh. G at 4-7; Tr. at 148) She further opined that B█████ should start at the McCarton Center as soon as possible by 7/5/05 to remediate the regression caused by BBF. (Tr. at 149)

Dr. M█████ R., the mother, testified that she expressed concerns about BBF on or about 6/04 because there were no parent/teacher monthly clinic meetings from 6/04 to 9/04. She stated that she was very frustrated by B█████s newly acquired negative behaviors so she brought in an outside team to address these behaviors. (Tr. at 159; 163) She recalled the large amount of turnover of staff at BBF. She stated that on 12/13/04, she received a letter from the principal of BBF (Exh. C) informing her that Steve would not return. She recalled that Steve was the second teacher to leave B█████s class. (Tr. at 164) She related that she was unable to observe B█████ at school until 12/17/04, when she observed there was no teacher for B█████s class. She stated there were no lesson plans, no supervision and no instruction. She wrote a letter regarding her 12/17/04 visit to BBF and recalled that on 12/16/04 there was a large black and blue mark on his arm after school and when she spoke to the head teacher at BBF, Rose Suarez, there was no answer as to how B█████ was bruised. (Exh. D) She remembered that that the third teacher, Ms. Jackson, started in 1/05, but had no experience because this was her first job as an actual teacher. (Tr. at 165) She maintained that all the occupational therapists left BBF on or about 1/05. (Tr. at 171) Dr. R. averred that she wrote on 1/24/05 to ask Ms. Jackson if B█████s program could be rewritten because she believed that B█████

Case No. 59006

_____

could do more then the program indicated because he had mastered colors and shapes and it would frustrate B███████to again identify colors and shapes. She stated that there was no coherent lesson plan for B███████for the 2004-2005 school year and that his IEP was not followed. (Exh. H)  Dr. R. stated that Ms. Rose Suarez, stated that B███████s programs would be rewritten, but she had no confidence that Ms. Suarez, who had been B███████s teacher for the previous 2 years would rewrite his program. (Tr. at 180)  She stated that she requested that BBF provide her with the data collected to demonstrate the progress B███████has been in his programs and was told that data collection had stopped in 2003-2004. (Tr. at 183)

Dr. R. wrote to express her concern to CSE on 2/16/05 and requested that CSE consider a change in placement from BBF to the Hawthorne Country Day School (Hawthorne) at the 3/2/05 IEP meeting.  She recalled that the CSE representative told her that the placement would be referred to CBST.  She stated that she expressed her concerned to the CSE team at the 3/2/05 IEP meeting about the noisy, disorganized classes at BBF that she observed during the monthly clinics.  She told the 3/2/05 IEP team that she and her husband researched more appropriate placements for B███████and found Hawthorne to be appropriate.  Dr. R. stated that she thought that CBST would contact Hawthorne, but she was informed in 5/05 when she called CBST that CBST made no effort to contact Hawthorne. (Tr. at 169)  She recalled that when she contacted Hawthorne in 5/05, she was told that there was no slot for B███████because no one from CBST contacted Hawthorne from 3/2/05 until 5/05.  She related that she spoke to Rosa DeNoone, the contact person from CBST, frequently to ascertain if CBST had found a placement for B███████ and Ms. DeNoone told her that B███████s file was sent to numerous schools in Manhattan, however, as of 6/3/05, there were no vacancies for in Manhattan to start in 9/05.  Dr. R. recalled that Ms. DeNoone told her that she would sent out his file to Queens, Brooklyn and Long Island. (Tr. at 48, 167)

Dr. R. stated that she requested this due process hearing on 4/14/05 (Exh. P) because she was afraid that B███████s file that was supposed to be sent to schools after the 3/2/05 IEP meeting was not sent anywhere. (Tr. at 185)  She recalled that on 5/16/05,

she received a letter (Exh. T) advising her that B■■■■■s speech teacher resigned. (Tr. at 187) Dr. R. submitted a letter from BBF confirming the speech provider resigned on May 12, 2005. (Exh. JJ) Dr. R. explained that based on her conversations with Ms. DeNoone and because there was no opening at Hawthorne, she and her husband contacted Dr. Cecelia McCarton, who had been B■■■■■s developmental pediatrician for the past 5 years and Dr. McCarton suggested the B■■■■■ attend the McCarton Center where ABA therapy and the related services of OT and speech/language can be provided on site on a daily basis.  She stated that Ms. Frenette trained the therapists at the McCarton Center and that it was the only appropriate placement for B■■■■■that had an opening in 7/05. (Tr. at 170)  Dr. R. explained the financial burden to provide after-school therapy for B■■■■ for the 2004-2005 school year. Dr. R. opined the rates charged by the McCarton Center were comparable to the rates charged by other providers. (Tr. at 174) She stated that she and her husband cooperated fully with BBF and were very involved parents, (Tr. at 184) but could not afford to remove him from BBF during the 2004-2005 school year to provide full-time services at home. (Tr. at 176)

Dr. R. explained that on 5/17/05, Dr. Jeffrey Newcorn, B■■■■■s pediatric psychiatrist for the past 4 years, wrote to letter and recommended a placement in a small class with individualized work with considerable structure and supervision using ABA. (Exh. W; Tr. at 189)  She stated as a parent she was frustrated by the lost skills during the 2004-2005 school year and she submitted all the letters from B■■■■■s doctors to CSE. (Exhs. U, W)  Dr. R. noted that on 5/15/05, Ruth Nass, M.D., Pediatric Neurologist of NYC Medical Center, evaluated B■■■■ and recommended the B■■■■ be place in "an intensive and comprehensive educational program with educators properly trained to work with children with autistic spectrum disorders." (Exh. U)

On cross Dr. R. acknowledged that she expected BBF to be able to educate her child and that she was notified of all the program changes when personnel left BBF. (Tr. at 196)  She stated that on the 3/2/05 IEP meeting, she requested a change in placement and additional extended ABA services and OT services of B■■■■■. (Tr. at 198)  She stated that she spoke to the classroom teachers, the head teacher, the principal at BBF and

Case No. 59006

she wrote to the head of AHRC, because BBF is a New York State approved school for autistic children.

Dr. R. described the SNACK program as a socialization program for autistic children where the children participate in music, arts and gym time. (Tr. at 234)  She stated the Director of SNACK, Clare Ferramosca, would be working with B⬛ at the McCarton Center.  She stated that the SNACK therapist work on the same ABLLS program that Lisa Frenette used. (Tr. at 237)  Dr. R. submitted a summary of the sessions with SNACK, (Exh. FF) the contract from SNACK (Exh. GG) and a brochure from SNACK. (Exh. HH)

Dr. R. recalled that at the 6/2/05 IEP team meeting, Rose Suarez, the head teacher at BBF, told her that the IEP team was supposed to go over the goals.  She stated that she and her husband had no input to develop the goals. (Tr. at 242; Exh. KK)  She related that Ms. Suarez told her that there was currently no speech therapist at BBF.  Dr. R. stated that she was told that B⬛ would remain in BBF for 2005-2006.  Dr. R. explained that she and her husband furiously reminded the 6/6/05 CSE team of the conclusion of the 3/2/05 IEP meeting where all parties agreed that BBF was not appropriate. (Tr. at 245; Exh. KK)  She recalled that the 6/6/05 IEP team told her that B⬛s case would be referred to CBST.  She recalled that she and her husband were concerned with a long bus ride for B⬛ and submitted a letter from Dr. Meryl Newman-Cedar, his pediatrician since birth, who recommended a short bus ride because a long commute could make B⬛ tired, dehydrated and increase his susceptibility to getting sick. (Exh. MM)  She stated that the McCarton Center was 3 blocks from her home. (Tr. at 249)  She submitted the schedule from the McCarton Center. (Exh. OO)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The legal standard applicable to a request for reimbursement for educational services, such as in this case, is well established: (1) the services offered by the Department of Education are inadequate or inappropriate, (2) the services selected by the parent are appropriate; and (3) equitable considerations support the parent's claim.  (School Committee of Burlington v. Department of Education of Massachusetts, 471 U.S. 359

Case No.  59006

_____

[1985])    The Department of Education bears the burden of demonstrating the appropriateness of the program recommended by its CSE.  (<u>Matter of Handicapped Child</u>, 22 Ed. Dept. Rep. 487; New York State Review Officer's Decision, Nos. 97-44; 93-9)  The Department of Education must establish that it appropriately ascertained the child's educational needs and prepared an IEP in accordance with the procedural and substantive requirements of federal and State Regulations.  (34 CFR 300.343-346; 8 NYCRR 200.4 and 200.5)  The parents assertion that B██████s 3/2/05 and 6/6/05 IEPs were not prepared in accordance with the procedural and substantive requirements of federal and State regulations was not disputed.  Based on the foregoing, I find that the Department of Education failed to demonstrate the appropriateness of B██████s program for the 2004-2005 school year.

The parents have the burden to prove that the services they obtained for B██████ are appropriate to his needs.  The fact that the facility selected by the parents to provide special educational services to the child is not State-approved as a school for children with disabilities is not dispositive of the parent's claim for tuition reimbursement. (<u>Florence County School District Four v. Carter by Carter</u>, 114 S.Ct. 361 [1993])  The parents must prove that B██████will receive an appropriate educational benefit from the program at the non-public school, and the parents offered substantial evidence to meet their burden.  The evidence presented demonstrated that B██████s 2004-2005 home program with one–to-one ABA therapy from IBI and OT where distractions are minimal are appropriate to meet the child's educational needs.  I note the Ms. Frenette's graphs of B██████s behavior indicated that his aggressive behavior and other negative behavior declined. (Exh. PP)  I further note that the ABLLS assessment by Ms. Frenette confirmed B████n's progress in verbal behavior.  I therefore find that the parents have met their burden regarding the at-home program of B██████ for the 2004-2005 and the OT from Susan Foley.

The evidence is clear that when faced with no viable alternative, the parents' placement in the McCarton Center was appropriate given the Department of Education's failure to provide FAPE for the 2004-2005 school year and CBST's failure to find an

Case No.  59006

---

appropriate placement for the 2005-2006 school year.  Ms. Frenette established that
B████ is able to receive ABA instruction similar to her ABA instruction at the
McCarton Center.  I find the McCarton Center is an appropriate placement for the 2005-
2006 school year.  I find the amount requested for the McCarton Center reasonable and
the parents' request for the costs of providing ABA from Lisa Frenette at IBI and related
services provider, Susan Foley and SNACK is also reasonable.

     In <u>Application of the Board of Educ. of the City School Dist. of the City of New
York</u>, Appeal No. 94-11, the SRO held that:

> "It is the hearing officer's responsibility to
> determine the appropriateness of the program and services
> set forth in the child's IEP for the year during which the
> IEP will be in effect.  The IEP, which was before the
> hearing officer in this instance, was intended to be in
> effect from January through June 1994, and in any event,
> would not have been valid beyond January 1995.
> Consequently, the hearing officer's review should have
> been limited to the IEP which was before her, and my
> review will be limited to such IEP."

     I note that on page 2 of B████s IEP specifically states that the duration of
services is to be for one year.  In addition, the IEP reflects that the CSE did not intend to
review the IEP again until 6/06.  I find the IEP is a federal document and since the 6/6/05
IEP was intended to be in effect from 6/6/05 through the following year and was intended
to be reviewed on 6/06, my decision will be effective from the date of my decision
through 6/30/06.

     The third prong of the test for tuition reimbursement is whether the equities favor
the parent's position.  I find that the equitable considerations do support the parents'
claim for reimbursement.  In this case, the parents fully cooperated with the Department
of Education.  The parents visited BBF when allowed.  The parents attended every clinic
meeting and the parents spent time speaking to the teachers, the aides, the head teacher
and the principal to express their concerns and the school staff did not respond to the
parents' efforts.  The Department of Education did not contest the parents' claim that the
program they created for B████was appropriate to meet his needs.

Case No. 59006

_____

## ORDER

Accordingly, it is Ordered that the Department of Education shall reimburse the parents $15,581.25 plus $1,360 for ABA therapy from Lisa Frenette from 6/23/04 through 5/21/05. (Exh. Z; Tr. at 263) I note the parents submitted invoices and cancelled checks for Lisa Frenette totaling $15,581.25. (Exh. AA)  It is Ordered that the Department of Education shall reimburse the parents $6,500 for the OT for 1 hour per week from 7/24/04 through 6/9/05 provided by Susan Foley at The Sensory Circuit.  I note invoices from Susan Foley were submitted (Exh. EE) and the parents submitted cancelled checks for Susan Foley totaling $6,500. (Exh. AA) It is Ordered that the Department of Education shall reimburse the parents $2,700 for SNACK from 10/1/04 through 7/1/05. (Exh. FF) I note the parents submitted cancelled checks for SNACK totaling $6,500. (Exh. AA).

It is Ordered that the Department of Education shall advance payment for the McCarton Center from 7/5/05 through 6/30/06 for Speech and Language Therapy for 4 hours per week @ $155 per hour; OT for 3 hours per week @ $155 per hour; and ABA Therapy for 24 hours per week @ $130 per hour for a total of $4,205 per week, and for 2 to 4 hours of supervision per week @ $175 per session and for monthly meetings for program development @ $175 per hour. (Exh. OO at 3) It is Ordered that the Department of Education shall advance payment for OT twice per week for 45 minutes per session from Susan Foley at the Sensory Circuit for a total of $260 for 2 hours of OT @ $130 per hour per week from 7/5/05 through 6/30/06.  It is Ordered that the Department of Education shall advance payment at SNACK for 2 hours per week for total of $100 per week.

Dated:  August 4, 2005

*Linda Agoston*

LINDA AGOSTON, ESQ. (gm)
Impartial Hearing Officer

LA:ds

Case No.  59006

---

**PLEASE TAKE NOTICE**

      **Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.**

      **"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed.  The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed.  If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period."  (8NYCRR279.2[b])  Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.**

      **Directions and sample forms for filing an appeal are included with this decision.  Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.**

Case No.  59006

---

## DOCUMENTATION ENTERED INTO RECORD JUNE 10, 2005

| | | |
|---|---|---|
| A. | Classroom Management Plan, 10/5/04, 12 pp | Parent |
| B. | Letter from Parents to CSE Chairperson, 11/23/04, 1 p. | Parent |
| C. | Letter from Joseph P. Cordasco, Principal of BBF, 12/13/04, 2 pp. | Parent |
| D. | Dr. M█████ R███ s Classroom Observation, 12/17/04, 1 p. | Parent |
| E. | The Sensory Gym Invoices and Cancelled Checks, 1/5/05 to 3/2/05, 12 pp. | Parent |
| F. | Letter from Sudha Ramaswamy to Parents, 1/11/05, 1 p. | Parent |
| G. | IBI Associates Invoices and Cancelled Checks, 1/17/05 to 3/15/05, 7 pp. | Parent |
| H. | Dr. R███ s School Observation, 1/24/05, 1 p. | Parent |
| I. | Letter from Parents to CSE Chair, 1/27/05, 2 pp. | Parent |
| J. | School Observation by Lisa Frenette, 2/15/05, 11 pp. | Parent |
| K. | Letter from Parents to CSE, 2/16/05, 1 p. | Parent |
| L. | OT Recommendation by Susan Foley, 2/18/05, 1 p. | Parents |
| M. | IEP, 3/2/05, 16 pp. | Parents |
| N. | Letter from Jeffrey H. Newcorn, MD, 3/14/05, 1 p. | Parents |
| O. | Letters from Parents to CSE, 4/4/05, 5 pp. | Parents |
| P. | Request for Hearing, 4/14/05, 5 pp. | Parents |
| Q. | Letter from CSE to Parents, 4/15/05, 1 p. | Parents |

Case No.  59006

---

| R.  | Letter from Parents to CSE, 4/26/05, 2 pp. | Parents |
| S.  | Pictures, 5/05, 4 pp. | Parents |
| T.  | Letter from Joseph P. Cordasco to Parents, 5/16/05, 1 p. | Parents |
| U.  | Letter from Ruth Nass, MD, 5/17/05, 1 p. | Parents |
| V.  | Annual Progress Reports (BBF) 5/20/05, 9 pp. | Parents |
| W.  | Letter from Jeffrey H. Newcorn, 5/27/05, 1 p. | Parents |
| 1   | IEP, 6/6/05, 17 pp. | Department of Education |

## DOCUMENTATION ENTERED INTO RECORD JUNE 23, 2005

| X.  | Letter of Acceptance, Costs and Schedule for the McCarton Center, 6/14/05, 3 pp. | Parents |
| Y.  | OT Progress Report from the McCarton Center, 4/18/03, 3 pp. | Parents |
| Z.  | Summary of ABA Costs from IBI Associates, 6/23/04 to 4/30/05, 1 p. | Parents |
| AA. | Copies of Cancelled Checks for Payment to IBI, Susan Foley and SNACK, 7/2/04 to 5/20/05, 14 pp. | Parents |
| BB. | Invoices from IBI, 7/16/04 to 4/30/05, 10 pp. | Parents |
| CC. | Summary of OT Costs from Susan Foley, 7/29/04 to 5/4/05, 1 p. | Parents |
| DD. | Contract with Sensory Circuit and Gym from Susan Foley, 7/29/04, 2 pp. | Parents |
| EE. | Invoices from Sensory Circuit and Gym, 9/29/04 to 3/2/05, 23 pp. | Parents |

Case No.  59006

---

| FF. | Summary of Costs from SNACK, 10/1/04 to 6/17/05, 1 p. | Parents |
|-----|-----|-----|
| GG. | Enrollment Agreement from SNACK, 10/1/04 to 6/17/05, 4 pp. | Parents |
| HH. | Description of SNACK Activities, Undated, 5pp. | Parents |
| II. | Letter from Joseph P. Cordasco, Principal of BBF, 5/16/05, 1 p. | Parents |
| JJ. | Phone Call Log of Conversations Between Ms. DeNoone and Dr. R███████, 6/2005, 1 p. | Parents |
| KK. | Transcript of Annual Review Meeting, 6/6/05, 2 pp. | Parents |
| LL. | Letter from Jeffrey Newcorn, MD, 6/13/05, 1 p. | Parents |
| MM. | Letter from Meryl Newman-Cedar, MD, 6/14/05, 1 p. | Parents |
| NN. | Copies of home therapy schedules, 2000-2005, 5 pp. | Parents |
| OO. | Letter from McCarton Center and weekly schedule, 6/14/05, 3 pp. | Parents |
| PP. | Graphs of Behavior, Undated, 5 pp. | Parents |
| QQ. | ABLLS Assessment, Undated, 3 pp. | Parents |

FINDINGS OF FACT AND DECISION

| | |
|---|---|
| Case No. | 104820 |
| SED ID No. | 20156 |
| Student's Name: | B█████ B█████ |
| Date of Birth: | March 4, 1996 |
| District: | 15 |
| Hearing Requested by: | Parents |
| Dates of Hearings: | June 28, 2006<br>August 8, 2006 |
| Record Close Date: | September 8, 2006 |
| Hearing Officer: | Mindy G. Wolman, Esq. |

Findings of Fact and Decision                                          Page 1
Case No. 104820
_____

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 28, 2006

| | | |
|---|---|---|
| Randi M. Rothberg, Esq. | Attorney | Parents |
| David S. Zweiman | CSE Chairperson's Designee | Department of Education |

## NAMES AND TITLES OF PERSON WHO APPEARED ON AUGUST 8, 2006

| | | |
|---|---|---|
| Dr. M███ R███ | Mother | |
| Dr. F███ B███ | Father | |
| Gary Mayerson, Esq. | Attorney | Parents |
| Joseph Sepcaru | CSE Region 8 Representative | Department of Education |
| Mary Lowrey | ABA Supervisor, McCarton Center | Parents |
| Jaqueline Ceonzo | Executive Director, SNACK Center | Parents |
|  (By Telephone) | | |
| Evy Libien | Speech-Language Pathologist | Parents |
|  (By Telephone) | | |
| Michelle Cook | Occupational Therapist | Parents |
|  (By Telephone) | | |

## DOCUMENTS ENTERED INTO THE RECORD JUNE 28, 2006[1]

| Exh.<br>No. | Description | Party |
|---|---|---|
| IHO-1 | Memorandum from Hearing Officer, 6/8/06, 1 p. | Hearing Officer |
| IHO-2 | Decision on District's Second Notice of Insufficiency, 6/19/06,<br>1 p. | Hearing Officer |
| A. | WITHDRAWN | Parents |
| B. | WITHDRAWN | Parents |

---

[1] The documents entered into the Record as Parents's Exhibits A and B on June 28, 2006 were
withdrawn on August 8, 2006 and re-entered as Exhibits A and C.

Findings of Fact and Decision                                      Page 2
Case No. 104820

## DOCUMENTS ENTERED INTO THE RECORD AUGUST 8, 2006

Exh.
No.    Description                                                   Party

A.    Demand for Due Process, 5/30/06, 3 pp.                         Parents
B.    Pendency Order, 6/29/06, 4 pp.                                 Parents
C.    IHO Linda Agoston's Decision, 8/23/05, 23 pp.                  Parents
D.    New York City Board of Education IEP, 3/2/05, 16 pp.           Parents
E.    Speech and Language Progress Report, 7/26/06, 2 pp.            Parents
F.    ABA Programming and Progress Report, 7/26/06, 7 pp.            Parents
G.    Occupational Therapy Progress Report, 6/22/06, 4 pp.           Parents
H.    Letter from Mandi Purvis, 6/9/06, 1 p.                         Parents
I.    Information about SNACK 6/7/06, 9 pp.                          Parents
J.    Educational Report, 6/5/06, 11 pp.                             Parents
K.    Enrollment Form, 5/26/06, 1 p.                                 Parents
L.    Letter from Linda D. Dahl, M.D., 5/16/06, 1 p.                 Parents
M.    Letter from Jeffrey M. Newcorn, M.D., 5/15/06, 1 p.            Parents
N.    Letter from Ruth Nass, M.D., 5/15/06, 1 p.                     Parents
O.    Letter from Meryl Newman-Cedar, J.D., 5/4/06, 1 p.             Parents
P.    SNACK Progress Notes, October 2005-April 2006, 4 pp.           Parents
Q.    Dr. Resh's observations, June 2005-May 2006, 5 pp.             Parents
R.    Carole A. Fiorile, Resume, undated, 5 pp.                      Parents
S.    SNACK invoices, receipts and cancelled checks, 6/06, 6 pp.     Parents
T.    SNACK Fees and Schedule Information, 2006-207, 1 p.            Parents
U.    B████████s Summer Schedule, 2006, 1 p.                         Parents
V.    McCarton Center Invoice Breakdown, July 2005-June 2006, 1 p.   Parents
W.    Cancelled checks, June 2006, 2 pp.                             Parents

## DOCUMENTS ENTERED INTO THE RECORD SEPTEMBER 8, 2006 (Post-Hearing)[2]

IHO-3  Decision on District's Notice of Insufficiency, 6/16/06, 1 p.      Hearing Officer

---

[2] This document should have been, but was not, entered into the Record at the August 8, 2006 earing.

On May 30, 2006, the parents of B███████ B., by their attorneys, Mayerson & Associates,
filed a request for an impartial hearing under the Individuals with Disabilities Education Act, 20
U.S.C. section 1415(f)(1) and Section 4404(1) of the New York State Education Law. I was
appointed as hearing officer on June 2, 2006, and the matter came on for hearings on June 28,
2006 and August 8, 2006.

The compliance date for issuing a decision has been extended at the Parents' request
(based on due process reasons), to September 14, 2006. Lists of the persons who appeared at the
hearing and the documentary evidence submitted are appended to this Order.

## PROCEDURAL HISTORY

The District filed two challenges to the sufficiency of the due process complaint. I ruled
that the first Notice of Insufficiency "could not be considered because the School District did not
provide a copy to the parent(s) and/or the parent(s) attorney" (Exh. IHO-3). I found that the
second Notice of Insufficiency "was not timely filed and the hearing request must be deemed to
be sufficient" (Exh. IHO-2)

On June 29, 2006, I issued a Pendency Order, based upon the parties agreement that the
Hearing Officer Agoston's unappealed "Amended Findings of Fact and Decision" (Exh. C)
constituted the student's pendency placement. That order directed as follows:

> 1.    The Department of Education shall arrange for
> payment, upon the submission of invoices after services are
> rendered, for the following services as and for B███████s
> pendency placement: (a) four 60-minute sessions of 1:1 speech and
> language therapy per week; (b) five 60-minute sessions of 1:1
> occupational therapy per week; (c) twenty-four hours of 1:1 ABA
> (Applied Behavioral Analysis) therapy per week; (d) two monthly
> meetings for program development; (e) two to four hours per week
> of supervision; and (f) two hours per week at SNACK (the Special
> Needs Activity Center for Kids).
> 2.    The Department of Education shall arrange for the
> payment of the aforementioned pendency services on a twelve-
> month basis, starting on July 1, 2006 and continuing during the
> pendency of the within action and any appeals to the State Review
> Officer.

Findings of Fact and Decision                                          Page 4
Case No. 104820

     3.     The costs of such services shall not exceed the following rates: $155.00 per hour for speech and language therapy and occupational therapy; $130.00 per hour for ABA Therapy; $175.00 per session for monthly meetings and supervision.; and $50.00 per hour for SNACK.  (Parent Exh. B)

## BACKGROUND AND POSITIONS OF THE PARTIES

     B████████ is ten years old and has been diagnosed with pervasive developmental delay ("PDD"), an autism spectrum disorder.  He is classified as a student with a disability under the autism disability classification. His classification is not in dispute.  His parents contend, and the Department of Education concedes, that the Department of Education did not offer him an appropriate program and placement for the Summer of 2006 and the 2006-2007 school year. They have unilaterally placed him at the McCarton Center for Developmental Services (the "McCarton Center"), and are seeking an order directing the Department of Education to prospectively pay for the cost of services at the McCarton Center. As part of his educational program, he also attends the Special Needs Activity Center for Kids ("SNACK"). His parents have also requested that the Department of Education reimburse them for the cost of the SNACK program.

     The parents contend that the combination of the McCarton Center and SNACK programs will meet B████████s special education needs and that equitable factors support their claim for reimbursement. They further contend that they do not have the financial means to pay for all of the services.

     The Department of Education challenges the contention that the McCarton Center and SNACK programs will meet B████████s special education needs, and took the position that equitable factors do not support reimbursement because the cost of the programs is too high.  The Department of Education took no specific position with respect to whether or not the Parents are entitled to prospective funding.

## TESTIMONY AND DOCUMENTARY EVIDENCE

The Department of Education did not offer any testimony or documentary evidence.

The testimony offered on behalf of the parents included the testimony of the student's

mother, as well as the testimony of staff from the McCarton Center and SNACK. Their

documentary evidence included the following: correspondence, a hearing officer's decision for

the 2005-2006 school year, an Individualized Education Program ("IEP") prepared by the

Department of Education's Committee on Special Education ("CSE"), program descriptions and

progress reports, an educational report, enrollment documents, parental notes, and financial

documentation.

The testimony and documentary evidence will be discussed more fully below.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A board of education may be required to pay for educational services obtained for a child

by the child's parent, if the services offered by the board of education were inadequate or

inappropriate, the services selected by the parent were appropriate, and equitable considerations

support the parent's claim. [Florence County School District Four v. Carter, 510 U.S. 7 (1993),

School Committee of Burlington v Department of Education of Massachusetts, 471 U.S. 359

(1985)]. The party seeking to challenge an IEP under the IDEA, which in this case is the

student's parents, bears the burden of persuasion. [Shaffer v. Weast, 126 S.Ct. 528 at 537 (2005);

Cabouli v. Chappaqua Central School District, 2005 WL 3500287 (SDNY, 2005)].

The Department of Education "conceded prong one" of the Burlington/Carter analysis at

the hearing, thereby acknowledging that it did not offer the student an appropriate program and

placement.

The parents have the burden of establishing the appropriateness of the placement and

program that they have chosen for their child. (Application of a Child with a Disability, Appeal

No. 95-57; Application of the Bd. of Educ., Appeal No. 02-093). In order to meet that burden,

they must show that the private school offered an educational program which met the student's

special education needs (Burlington, 471 U.S. at 370; Application of a Child with a Disability,

Appeal No. 94-29). The private school need not employ certified special education teachers, nor

have its own IEP for the student (Application of a Child with a Disability, Appeal Nos. 94-20;

02-093).

B███████ began attending the McCarton Center Program in July of 2005. The McCarton

Findings of Fact and Decision                                              Page 6
Case No. 104820

Center is providing ███████ with 24 hours per week of Applied Behavior Analysis ("ABA")

services, four forty-five minute sessions per week of speech and language therapy, and four forty-

five minute sessions per week of occupational therapy.  The other components of the McCarton

Center program includes team meetings and supervision, and parent training/counseling.  The

testimony and progress reports of Mary Lowrey (ABA Supervisor from the McCarton Center),

Evy Libien, (a speech and language pathologist from the McCarton Center), and Michelle Cooke

(an occupational therapist from the McCarton Center) all supported the contention that the

McCarton Center Program is meeting ███████s special education needs (Tr. 8/8/06; Exhs. E,

F, and G). Their testimony was support by their progress reports (Exhs. E, F and G). ███████

has made progress across all domains. His receptive and expressive language skills have

improved, his maladaptive and self-stimulatory behaviors have decreased, and he has been

making progress in academic and daily living skills.

        ███████ has been attending the SNACK program since October of 2004. Although it is

an "after-school" program, the SNACK program appears to be part of the package of services

that is addressing ███████s special education needs.  In her testimony, Jacqueline Ceonzo

(Executive Director of SNACK) explained that SNACK provides standard after school activities,

with extra support for children with special needs. Many of the children in the program have

autistic spectrum disorders. The program addresses some of ███████s behavioral issues and

assists him in learning how to generalize the skills he has learned to other environments, as well

as learning how to constructively utilize leisure time.  (Exhs. H and  I)

        The various medical professionals who are involved with ███████recommend

continuation of the McCarton Center services and SNACK programs (See Exhs. L, M, N, and

O). In addition, his parents retained a Board Certified Behavior Analyst/Educational Consultant

(Carol A. Fiorile, Ph.D., BCBA, SAS) to observe ███████at the McCarton Center and to make

recommendations as to whether or not it continues to be an appropriate program for him. Dr.

Fiorile (whose resume was entered into evidence as Exh. R) observed ███████over the course

of the entire day on May 31, 2006. She also met with Mary Lowery and reviewed program graphs

and data. Dr. Fiorile concluded that ███████needs to be in a program with staff that is well

Findings of Fact and Decision                                          Page 7
Case No. 104820

trained in behavior management techniques. The program also needs to be "data-driven." His reinforcers need to be "carefully assessed and re-evaluated frequently." The program should address broad skill development, rather than over-emphasizing one skill area. His program needs to address basic skills, language skills, motor skills and self-help skills. She opined that the McCarton Center program met all these requirements. It provides the level of support that ██████ needs. She also opined that it is necessary to continue the intensity and frequency of services that the McCarton Center has been providing. Dr. Fiorile also opined that it was necessary to continue ██████s program at SNACK, as the program provides ██████ with opportunities for the generalization of skills (particularly language skills), as well as the opportunity to engage in less structured social and play activities. (Exh. J).

        ██████s mother also testified about the vast improvement that ██████ has made since beginning at the McCarton Center in July of 2005. His language development and skill-acquisition has been particularly striking, as it followed several years of minimal progress at his prior placements. Based upon the testimony of ██████s mother, the staff from the McCarton Center and SNACK, and on the supporting progress reports and Dr. Fiorile's report, I find that the programs at the McCarton Center and SNACK are meeting ██████s special education needs.

        Turning to the issue of whether equitable factors support the Parents' request for tuition reimbursement, I find that they do. ██████s parents have cooperated withe the CSE and provided appropriate notice of their intent to continue him at the McCarton Center and SNACK programs. The Department of Education argued that "the rates are outrageous and the services can be provided to this child at a lower rate" (Tr. 8/8/06 at p. 31). This contention is not supported by anything in the Record. The McCarton Center charges $155.00 per session for speech and language therapy and occupational therapy, $130.00 per hour for ABA services, and $175.00 per hour for monthly meetings, supervision, and parent training. All of ██████s services are highly individualized and provided on a 1:1 basis. His program is regularly reviewed and modified as his behavior and progress toward his goals is monitored. All of the testimony at the hearing supported the Parents' contention that the McCarton Center fees are

consistent with fees charged by other providers and agencies in the New York City area. The
SNACK program costs $50 an hour (with the swimming component costing $55.00 per 30-
minute session). There is a staffing ratio of 2:1 for most of the program, with the swimming
component having a 1:1 staffing ratio. In the absence of anything in the Record to suggest that
the McCarton Center and SNACK program fees are unreasonable or excessive, there is nothing
to support the contention that equitable factors preclude tuition reimbursement.

      I note that the Department of Education's representative also argued that the SNACK
program charges for non academic components, including swimming, lunch, music and dance.
He stated that "the Department of Education cannot be held accountable for a program of such a
nature" (Tr. 8/8//06 at 161-162). At first blush, there is some merit to that argument. However,
upon closer examination it is clear that the SNACK program is an extremely important
component of his educational program. B███████ needs to be able to generalize his skills in a
less structured setting that the McCarton Center and he needs opportunities to socialize and use
his newly acquired language skills outside of the intensive 1:1 ABA environment. The SNACK
program provides these opportunities (Exh. J). In addition, the swimming and dance programs
constitute physical education. Part 100 of the Regulations of the Commissioner of Education
include physical education and the arts (including music and dance) as parts of the general
public school program requirements (see 8 NYCRR §§ 100.3 and 100.4). As such, the fact that
the SNACK program is not "strictly academic" does not preclude reimbursement. In addition to
being part of basic school requirements, the swimming, music and dance components of the
SNACK program are of educational value to B███████ because they assist him in the
generalization of developing skills in the area of attending, socialization, language, etc. The
"lunch" component of the program does that as well. The entire SNACK program is, therefore, a
necessary component of the educational program chosen by B███████s parents. It expands upon,
but does not duplicate, the McCarton Center services, and there is nothing inequitable about
requiring that the Department of Education bear the cost of the program.

      Based on the foregoing, I find that B███████s parents have satisfied the three criteria for
reimbursement set forth in the Burlington and Carter decisions. They are entitled to an order

Findings of Fact and Decision                                                    Page 9
Case No. 104820

directing that the Department of Education reimburse them for the cost of the McCarton Center
and SNACK programs.

    The final issue herein is whether the Parents are entitled to an order directing that the
Department of Education make "prospective payments" directly to the McCarton Center under
the decision in Connors v. Mills, 34 F.Supp.2d 795, Ed. Law Rep. 767 (N.D.N.Y., 1998). In that
case, the court held that "once the Burlington prerequisites relative to a non-approved private
school are met, and a parent shows that his or her financial circumstances eliminate the
opportunity for unilateral placement in the non-approved school, the public school must pay the
cost of private placement immediately" (Connors at 805-806).

    I note that the Department of Education did not specifically challenge the Parents' request
that the costs of the program be paid directly to the McCarton Center. Its challenge to the
Parents' claim for the payment for the McCarton Center services was limited to whether the
services were appropriate and to the actual cost of the program. It therefore appeared to concede,
the propriety of making payments directly to the McCarton Center upon the receipt of statements
for services rendered (after the services have actually been rendered).

    Moreover, I note that the Parents' request is also not technically for "prospective
payment," as the term prospective pertains to services that have not actually been rendered - such
as payment in full for annual tuition at the beginning of the school year. In this instance, the
Parents have requested that the Department of Education pay for services after the  services have
actually been rendered. None-the-less, since the Department of Education's  concession on the
prospective payment issue was implicit rather than explicit, and since the  payment for
educational services directly to the provider is not specifically addressed in the Burlington and
Carter decisions, the Connors issue must still be addressed.

    Although the Parents' income appears, at first blush, to be relatively high, the cost of the
McCarton Center and SNACK program are substantial and the Parents cannot in fact afford to
pay for the services pending reimbursement from the Department of Education. Both parents are
employed (B███████s mother is a cell biologist and biochemist, his father is a physician in
private practice). Their adjusted gross income on last year's tax return was approximately

Findings of Fact and Decision                                        · Page 10
Case No. 104820

$240,000.00.  This is pre-tax income, their after-tax income is about $144,00.00. Their monthly

expenses include $4,000.00 for mortgage and maintenance on a co-op apartment, $1,000.00 per

month for food, $1,500.00 per month for baby-sitting services (both parents work full-time),

$1000.00 per month for medical bills, $200.00 per month for telephone and cable, $200.00 per

month for Con Edison, $200.00 per month clothing, $100.00 per month for books and

educational material,. Their total monthly expenses are approximately $8,200.00, in addition to

the SNACK program (which costs in excess of $1,000.00 per month).  The total annual cost of

their basic monthly expenses and the SNACK program is over $110,000.00.  This leaves about

$34,000 for transportation and gas expenses, entertainment expenses, and many other items. (Tr.

8/8/06 at 38-40; 63-65)

        The cost of the McCarton Center services (24 hours of ABA services at the rate of

$130.00 per hour, four sessions per week of speech and language therapy and four sessions per

week of occupational therapy, each at the rate of $155.00 per session, and two to four hours per

month of supervision, team meetings, and parent training/counseling at the rate of $175.00 per

hour) for the 2006-2007 school year is will be somewhere between $213,000.00 and $218,000.00

(depending on the exact number of monthly supervision/team meetings and monthly parent

training/counseling sessions). The total reimbursement for the 2005-2006 school year was

approximately $215,000.00.

        The Parents' disposable income, after taxes, basic expenses, and the cost of the SNACK

program, is about $34,000.00.  It is readily apparent that they cannot advance the costs of the

McCarton Center program pending reimbursement by the Department of Education. As such, the

Parents are entitled to an order directing that the Department of Education make payments

directly to the McCarton Center upon the submission of bills for services rendered. As noted

above, the Parents will be advancing the cost of the SNACK program, and are entitled to an order

directing that the Department of Education reimburse them for that program.

Findings of Fact and Decision                                                    Page 11
Case No. 104820

**ORDER**

It is hereby ordered that:

1.     The Department of Education is directed to reimburse the parents for the cost of tuition for B██████s attendance at the SNACK program in an amount not to exceed $255.00 per week for the Summer of 2006 and the 2006-2007 school year; reimbursement shall be made within thirty (30) days of the submission of invoices and proof of payment.

2.     The Department of Education is further directed to make payments directly to the McCarton Center within thirty (30) days of the submission of invoices for the following services provided during the Summer of 2006 and the 2006-2007 school year:

        a.     Four (4) forty-five minute sessions per week of speech and language therapy, at a rate not to exceed $155.00 per session.

        b.     Four (4) forty-five minute sessions per week of occupational therapy, at a rate not to exceed $155.00 per session.

        c.     Twenty-four (24) hours per week of ABA services, at a rate not to exceed $130.00 per hour.

        d.     Four (4) hours month of supervision, team meetings, parent training, and parent counseling, at a rate not to exceed $175.00 per hour.

3.     To the extent that the Parents have made any payments to the McCarton Center for the Summer of 2006 or for the 2006-2007 school year, the Department of Education is directed to reimburse them (limited to the frequency and rates described in Paragraph 2 of this Order) within thirty (30) days of the submission of invoices and proof of payment.

Dated: September 13, 2006
*Mailed September 14, 2004*

                                      MINDY G. WOLMAN, ESQ.
                                        Impartial Hearing Officer

**APPEAL NOTICE ON NEXT PAGE**

Findings of Fact and Decision                                     Page 12
Case No. 104820

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the Board of Education of the City of New York has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.